UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DONTA IVORY,

    Petitioner,

v.

K. ALLISON, warden,

    Respondent.

                                /

No. C 11-4526 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Donta Ivory filed this *pro se* action seeking a writ of habeas corpus under 28 U.S.C. § 2254. The matter is now before the court for consideration of the merits of the habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

A. <u>Procedural History</u>

On May 29, 2008, an Alameda County Superior Court jury found petitioner guilty of first-degree murder and unlawful firearm possession by a former ward of the juvenile court. *See* Cal. Penal Code § 187 and former § 12021(e). The jury also found that petitioner had personally and intentionally discharged a firearm resulting in death, personally and intentionally discharged a firearm, and personally used a firearm. The court found true petitioner's two prior convictions and sentenced him to 75 years to life in prison.

Petitioner appealed. The California Court of Appeal affirmed the convictions, and the California Supreme court denied his petition for review.

Petitioner then filed this action, seeking a writ of habeas corpus. On December 12, 2011, this Court issued an order to show cause on the due process claims alleged, which were: that the trial court erred in allowing the prosecution to use a prior robbery adjudication for impeachment purposes, and that the court failed to properly instruct the jury on aiding and abetting. Respondent filed an answer and petitioner filed a traverse.

B.  The Crimes

The following factual background is taken from the order of the California Court of Appeal.

> The trial evidence indicated that on December 14, 2005, police responding to a call reporting a shooting on the 1300 block of 97th Avenue in Oakland, found defendant fighting with a man over a revolver at the bottom of an apartment house's rear stairs, and a woman laying at the top of the stairs suffering from an apparent gunshot wound. The man, Jerome Williams, said defendant had just shot his girlfriend, Malea Tufono. She later died of a gunshot wound to her torso. Police confiscated the revolver, a shotgun on the grass by the stairs, and three sandwich bags of marijuana in Williams's pockets. On their way to the scene, they also saw a white Oldsmobile, possibly an Aurora, speeding from the area of the shooting.
>
> A police department firearms examiner testified that the .357 caliber revolver had fired the bullet removed from Tufono's body. The expert also stated that the pistol required four pounds of trigger pressure to fire, and could be fired if someone held the trigger while someone else pulled on the revolver in a certain way.
>
> Testimony of Jerome Williams
>
> Jerome Williams testified that he was placed in a drug diversion program in April 2005 for narcotics possession; and although he knew he was not supposed to own or possess narcotics, he was selling marijuana in December 2005. He was later convicted of carrying a concealed weapon, and at the time of trial was serving a 90-day sentence for violating probation following a grand theft conviction.
>
> Williams testified that the prosecution told him that he would not be prosecuted if he testified that in December 2005 he was in possession of, or selling, marijuana, and in possession of a shotgun, but had not promised to seek early release from his 90-day sentence. However, after defendant loudly exposed his testimony in the presence of other inmates, the prosecution agreed to seek his immediate release.
>
> Williams said that in December 2005, he and Tufono were romantically involved and living in an apartment on 97th Avenue in Oakland. He kept a shotgun in a closet for protection because his neighborhood was "crazy." Sometime after 8:00 p.m. on December 14, a man named Art called. Williams had sold him marijuana before, and agreed to meet him at a nearby restaurant to sell him more. Art drove a white Aurora.
>
> Williams put some marijuana in sandwich bags, left his apartment, and went down the

2

building's back stairs. He saw two shadows in the dark and started to turn around when defendant and another man came out of the shadows. He heard a man's voice say words to the effect of, "Empty your pockets. Take it in. Take it back upstairs." He was ordered, "Face down. Look at the ground." A gun was put to the back of his head, which was down, and a man escorted him up the stairs with a hand on his shoulder

Halfway up the stairs, Williams heard Tufono say from the top of the stairs, "Let him go." A second man's voice said, "Shoot him. Shoot her. Shoot him. Shoot her." A gunshot was fired close behind him from the gun that had been placed to his head. He heard Tufono yell. He did not see a shotgun or hear one "being racked."

Williams turned around and began fighting with the man. The gun, the only one Williams saw that night, was still in the man's hand. They fell down. Williams bit the man in the eye and tried to hold him down, asking a neighbor to call the police. Williams wrapped his hand around a part of the gun, and the man shot once or twice, trying to shoot off his hand. The man asked his accomplice for help, but the second man ran away. While Williams held the man down, he answered a cell phone call from Art, who said he was in front of Williams's house; Williams asked for help, but Art never came.

The police arrived about 10 or 15 minutes after the fight started. Williams received treatment at a hospital for injuries to his hand and the back of his head. Williams did not tell police about his plan to sell marijuana to Art, and the police took the marijuana that Williams had with him.

Testimony of Robert Perazzo

Williams's neighbor, Robert Perazzo, testified that on the night of December 14, 2005, he heard "about two" shots fired on the stairs outside his apartment and a "young lady screaming something like, "Oh, my God. I've been hit." He went outside, where he saw a woman neighbor slumped over the stairs, bleeding, and a male neighbor scuffling with defendant over a gun.

Perazzo called the police and reported what was occurring. The audio recording of his call was played for the jury. As the two men fought over what Perazzo thought was a .357 caliber revolver, two more shots were fired and his neighbor was grazed. His neighbor said defendant had shot the woman and that, " '[t]hey ripped us off' of either the weed or the money." The fight lasted about five minutes.

Perazzo had received weapons training and owned a .357 caliber revolver. He thought the first two shots he heard were of the same velocity as shots fired from his revolver and did not hear a shotgun being fired.

Testimony of Sergeant James Rullamas

Oakland Police Department Sergeant James Rullamas testified that he interviewed defendant on December 15, 2005. In the first part, which was unrecorded, defendant said he went to 97th Avenue to buy marijuana, armed with a revolver, saw the seller beside a bag full of marijuana sacks, and decided to rob him. In a recorded interview later that day, which was played for the jury, defendant told a more complete version of the same story.

3

Testimony of Officer Craig Chew

Oakland Police Department Inspector Craig Chew testified that he participated in another recorded interview of defendant on the evening of December 15, 2005. Defendant said he went to 97th Avenue to purchase marijuana from a man he had met two or three months before, saw him walking down the rear stairs of a residence with a large bag of what defendant believed was marijuana, and decided to rob him. Defendant withdrew a loaded .357 Magnum revolver from his waistband, intending to rob the man and take him back into his residence. As he started to escort the man, the man tried to grab the barrel of defendant's gun, but defendant struck him once and gained control of the situation. Defendant saw a woman at the top of the stairs with a shotgun pointed at him. When she loaded a round into the shotgun's chamber, defendant cocked his gun; he and the man holding him told the woman to put the shotgun down. The man grabbed defendant's gun and it fired as defendant fell. The two fought until police arrived.

Chew said defendant was "very calm, very oriented, [and] very coherent" during the interview. He did not appear to be under the influence of alcohol or drugs, and was "very articulate." He did not admit that there were any other people with him that night to help him commit the crime. An audiotape of this interview was also played for the jury.

Defendant's Testimony

Defendant testified he was convicted of possession of a controlled substance for sale in 2000, and had admitted to second degree robbery as a juvenile in 1994. He and two friends, Huey Maxwell and Ira Hayes, sold marijuana.

On the night of the shooting, defendant gave Maxwell $700 to buy two ounces of marijuana and the two drove to Williams's residence, each armed with a firearm. Defendant did not think Hayes was a part of their plans and did not see his white Aurora, but later learned Hayes and Maxwell had planned to rob Williams without his knowledge.

Defendant followed Maxwell to the rear of the residence, where they met Williams, who had a large plastic grocery bag containing packages of marijuana. When Williams said he wanted $350 an ounce, Maxwell, to defendant's surprise, drew what looked like a nine-millimeter automatic, pointed it at Williams, and said, "Nigga, I'm keeping this."

A few seconds later, a woman appeared at the top of the stairs with a shotgun that she pointed at defendant. He drew his weapon to protect himself and Maxwell, and grabbed Williams, using him as a shield. He and Williams told the woman to drop the shotgun, but she "racked a round" instead. Defendant held his gun over Williams's shoulder and cocked it as he backed down the stairs. Williams grabbed it and the gun fired. Defendant did not pull the trigger and did not take deliberate aim at the woman. He did not hear the shotgun being fired; although the defense suggested that evidence indicated that the shotgun had been fired, it is not an issue in this appeal.

After a brief pause, Williams grabbed defendant and they tumbled down the stairs. Williams tried to take the gun from defendant, so defendant fired twice to scare him into letting go, but Williams did not. Defendant assumed Maxwell took off after the first shots were fired. The police arrived about eight or ten minutes after the fight began.

Defendant did not tell the authorities in his interviews who else was with him because

4

> he did not want to "snitch" on his friends. He thought he would still be in danger if he went to prison and he was worried about his grandmother, who still lived in the neighborhood. He decided to testify about Maxwell and Hayes because he "would be a fool" to spend the rest of his life in prison.
>
> On cross-examination, defendant testified further about his 1994 juvenile robbery. He also said that he did not know the felony-murder rule applied to accidental killings until the judge explained the law during voir dire.

*People v. Ivory*, 2010 WL 3213697, at *1-6 (Cal. Ct. App. Aug. 16, 2010).

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Alameda County, California, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. *See* 28 U.S.C. § 2254(b), (c). The parties do not dispute that the state judicial remedies were exhausted for the claims in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the

claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

A. <u>Impeachment with Prior Juvenile Conduct</u>

Petitioner contends that his right to due process was violated when the trial court allowed the prosecution to use a prior robbery adjudication for impeachment purposes when other misconduct was available to impeach petitioner. He also argues that the prior robbery was used to show propensity to commit robbery.

6

1. State Court Proceedings

The following description of petitioner's claim is taken from the California Court of Appeal's opinion:

> It was alleged in count 2 of the information that defendant had violated section 12021, subdivision (e), which bars a person under 30 from possessing a firearm if he or she previously committed a juvenile offense listed in Welfare and Institutions Code section 707, subdivision (b), including robbery. It was also alleged that defendant had been adjudged a juvenile ward for violating section 211, the robbery statute. The information also contained two prior conviction enhancement allegations, including one for juvenile robbery.
>
> Before trial, the court granted defendant's motion to bifurcate trial of the prior conviction enhancements, to which the people did not object, and ruled that any prior convictions were not admissible for substantive purposes. However, in order to prove the section 12021, subdivision (e) violation alleged in count 2, the People sought to establish that defendant had committed a juvenile robbery. Defendant's trial counsel said that, while he had not yet talked with defendant, he thought the defense would request "that the matter be held in abeyance so that he would enter a plea of guilty to that contingent upon a finding of the murder count." The court responded that "there's no such thing. I can't take that provisional guilty plea," and that defendant's choices were to have the entire count read to the jury or to stipulate to the elements of the charge. The court said a stipulation on the same charge had been entered into in another case recently, and the prosecution indicated it was amenable to one. The court noted, however, that the stipulation "became somewhat moot" because the defendant had testified, and was impeached with the prior juvenile act. At defense counsel's request, the court deferred the matter until counsel had the opportunity to confer with defendant.
>
> Subsequently, the court considered the prosecution's request that it be allowed to impeach defendant with his prior criminal conduct, including his 1994 juvenile robbery, should he testify. The court noted a problem with the juvenile robbery finding because "absent a stipulation or an agreement of the parties, the fact of the finding is not admissible to impeach, unlike the fact of a felony conviction. [¶] So if the court felt that the conduct was relevant under the entire analysis to be admissible for the purposes of impeachment, then counsel, one or the other or both, would have to inquire about the conduct itself that occurred and would be limited essentially in doing so to the essential elements of the conduct that make that conduct involving moral turpitude." The court held in abeyance any ruling until the prosecution provided discovery of its juvenile robbery records.
>
> Later in the trial, the prosecution read a stipulation in open court, before the jury, which stated "[t]hat on December 14, 2005, [defendant] was under 30 years of age, and Number 2, that before December 14th, 2005, the defendant had been found in violation of an offense listed in Welfare and Institutions Code Section 707 subdivision (b), and had been adjudged a ward of the juvenile court."
>
> Defendant subsequently testified on direct examination that he had a 2000 drug conviction and had admitted in 1994 to the commission of a juvenile robbery. Before cross-examination, the court, without defense objection, ruled that the prosecutor could ask about defendant's commission of the robbery because it was relevant to his credibility, but not about his use of a firearm during the robbery. On cross-examination, defendant testified that he walked into a bait shop, ordered the clerk to open the register, ordered the clerk down on the ground, and took the money from the register. He ordered

7

the clerk to put the best fishing reels in a bag, ordered the clerk to lie on the floor, and left the building. The defense did not object to the line of questioning that elicited any of this testimony.

Later in the cross-examination, the prosecutor, in questioning defendant about his role in Tufono's shooting, asked if people who commit robbery usually use weapons to force people to do things, and defendant agreed that this was the case. Again, the defense made no objection.

With regard to the second count, the jury was instructed, pursuant to the parties' stipulation, that the juvenile violation supporting the firearm charge was "a section 707(b) offense" without expressly referring to it as a robbery.

In closing argument, the prosecutor used defendant's testimony about the juvenile robbery to challenge defendant's credibility. The court instructed the jury that it could consider the prior criminal acts evidence in its evaluation of his credibility, but not regarding his liability for the charged crimes. The court did not further instruct the jury about this evidence.

*People v. Ivory*, 2010 WL 3213697, at *7-9.

The California Court of Appeal rejected petitioner's claim regarding the admission of evidence on procedural grounds. "Defendant did not attempt to limit the scope of cross-examination, or object to any of the prosecution's cross-examination questions. Defendant did not propose further jury instructions. Defendant has forfeited his appellate claim as a result." *Id.* at *6.

The state appellate court also rejected the claim on the merits. The court held that the trial court did not commit error by admitting the evidence of petitioner's juvenile robbery conduct for impeachment purposes. The trial court could admit prior juvenile conduct demonstrating moral turpitude, subject to the usual evidentiary limitations, *id.*, and "there can be little doubt robbery also involves elements that are pertinent to witnesses' veracity and honesty." *People v. Ivory*, 2010 WL 3213697, at *7 (citing *People v. Jackson*, 174 Cal. App. 3d 260, 266 (Cal. Ct. App. 1985).

The appellate court observed that the trial court's limitation on the scope of the cross-examination– allowing questions about the "element of robbery" while barring questions about firearm use– indicated that the trial court had balanced the relevance of the impeachment evidence with its potentially prejudicial nature consistent with Evidence Code § 352. *Id.* Although the prosecutor's line of questions suggested the use of coercive force, it was not

8

1 necessarily "apparent" that the force involved the use of a firearm specifically. *Id* at *8. 2 Similarly, although the jury was told that the juvenile violation supporting the firearm charge 3 was an offense under Welfare and Institutions Code § 707(b), this did not establish use of a 4 firearm. *Id.* The court further noted that defendant's conduct in the juvenile robbery had 5 similarities to his alleged conduct in the charged murder, but was not identical in that the prior 6 conduct involved a store robbery, had nothing to do with drugs, and did not involve violence. 7 *Id.* The court noted that numerous appellate courts had found that impeachment with a prior 8 conviction very similar or identical to the charged offense is permissible, and rejected 9 petitioner's argument. *Id.* The robbery was not necessarily so remote in time as to be 10 inadmissible, and that evidence of such conduct is admissible when a defendant has not led "a 11 legally blameless life" since the time of the conviction. *Id.*

12 The state appellate court also determined that any purported error by the trial court in 13 allowing impeachment with the juvenile robbery conduct was harmless. *Id.* Evidence of 14 defendant's guilt under the felony-murder rule was very strong, as he confessed in two interviews 15 the day after the shooting that he intended to rob Williams. *Id.* at 9. Defendant had conceded 16 that he was armed and standing very close to Williams when Tufono appeared, that he prepared 17 to fire his revolver at her, and that he deliberately fired additional shots as he wrestled with 18 Williams. *Id.* The court decided that in light of his confessions and testimony, defendant's 19 efforts to exculpate himself at trial were unpersuasive. *Id.*

20

21         2. <u>Analysis of Federal Constitutional Claim</u>

22 A district court may not collaterally review a state court evidentiary ruling unless it 23 violates federal law, either by violating a specific constitutional provision or by infringing upon 24 the due process right to a fair trial. *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Federal habeas 25 relief is not available for state law errors because the writ only can be issued if there was a 26 violation of the Constitution, laws or treaties of the United States. *See Estelle v. McGuire*, 502 27 U.S. 62, 67-68 (1991). The admission of evidence is not subject to federal habeas review unless 28

9

a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *but cf. Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ"). Furthermore, habeas relief for an erroneous evidentiary ruling of constitutional dimension would only be available if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

The California Court of Appeal's rejection of petitioner's due process claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court. As the state court pointed out, the trial court limited the scope of the cross-examination by allowing questions about the robbery but not the gun used in it. Petitioner put his own credibility at issue by testifying that he had not intended to rob Williams and that, although his gun may have fired the shot that killed Tufono, he did not intend to shoot her.

Petitioner argues that the evidence of his juvenile robbery was used to show a propensity to commit robbery. This argument fails to persuade. Although there was not an instruction specifically directing the jury not to use the evidence of another crime as propensity evidence, other jury instructions adequately conveyed to the jury that other-crimes evidence came in only for purposes of evaluating witness credibility. *See* CT 000211 ("During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other"); CT 000213 ("If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony"). There is no reason to depart from the presumption that jurors have followed the court's instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n. 9 (1985); s*ee also Richardson v. Marsh,* 481 U.S. 200, 206 (1987) (referring to "the almost invariable assumption of the law that jurors follow their instructions"). Using the presumption that the jury followed the court's instructions is particularly appropriate because the prosecutor argued in accord with those

10

1 instructions, i.e., that the other crime evidence was to be used for evaluating witness credibility and not as evidence that he committed this crime. *See* RT 596. The jury, following the court's instructions, would only have considered the prior crime evidence in its evaluation of petitioner's credibility. Petitioner has not shown that the admission of the prior crime evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.

Further, even if the admission of the prior juvenile conduct was error, it would have been harmless error. The prosecution evidence was strong. Petitioner's various efforts to avoid liability – with his story changing apparently in tandem with his understanding of the law– were damaging. His testimony as to what happened was internally inconsistent and differed in significant respects from his statement to the police just after the killing. His explanation of his conduct also was implausible and not consistent with the testimony of any other witness. As the California Court of Appeal suggested, petitioner's story at trial appeared to have been spun only after he realized how the felony murder rule worked and thereby learned that his initial "I was only there to rob Williams" tale would not have helped him avoid liability for killing Tufono. petitioner is not entitled to the writ on this claim.

B. <u>Instructional Error Claim</u>

Petitioner next argues that he was denied due process of law, a fair trial, and a jury determination of all issues because the court erred by failing to fully instruct the jury regarding aiding and abetting. His theory on this claim is that it was essential to fully instruct on aiding and abetting liability because he did not fit the definition of an aider and abettor. *See* Petition, p. 26. He argues that he was at most merely present during a robbery (having neither intent to rob nor the knowledge that Maxwell intended to rob) and did not draw his gun until after the robbery committed by Maxwell was complete and Maxwell had fled. *See id.* at 27, 30.

The trial court instructed the jury that a person could be guilty of robbery, or attempted robbery, as an aider and abettor, as follows:

> To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away

11

> the property to a place of temporary safety. [¶] ... [¶] However, as stated in Instruction 540A, for purposes of the felony-murder rule, the defendant must have intended to commit the felony of robbery or attempted robbery before or at the time of the act causing death. That is, if a defendant is guilty of robbery or attempted robbery as the actual perpetrator, he would be guilty of felony murder for any death caused in the course of that robbery or attempted robbery, keeping in mind that the robbery or attempted robbery continues until the perpetrator has reached a place of temporary safety as defined above. However, if a defendant is guilty of robbery or attempted robbery as an aider and abettor, he would be guilty of felony murder only if the death occurred at the time of or after defendant became an aider and abettor, including having the intent to commit the felony. If defendant's status as an aider and abettor is achieved after the death has occurred, he would be guilty of the felony but not of felony murder.

*People v. Ivory*, 2010 WL 3213697, at *13. The trial court did not, however, define aiding and abetting for the jury.

The California Court of Appeal ruled that the omission of an aiding and abetting definition was harmless error, if it was error at all. "Defendant apparently contends the jury could have believed his testimony that he did not intend to aid Maxwell in a robbery, even if he cocked his revolver at Tufono in part to protect Maxwell, who was robbing Williams at the time." *Id* at *14. "His argument is, to say the least, very unpersuasive." *Id*. The state appellate court noted that victim Williams testified that Maxwell was present after the shooting and petitioner testified that he assumed Maxwell fled after the first shots were fired – meaning that the robbery had not concluded when the killing took place. *Id.* The state appellate court also noted that the evidence of guilt was overwhelming. And the state court noted that the prosecutor had not pursued an aiding and abetting theory. *Id.*

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. at 72. The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. *Id.* An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. *Henderson v. Kibbe*, 431 U.S. 145,155 (1976). The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given. *Id.* at 156. A determination that there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution establishes only that an error has

occurred. *See Calderon v. Coleman*, 525 U.S. 141, 145 (1998). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings. *See Calderon*, 525 U.S. at 145-146.

The failure to define aiding and abetting for the jury did not so infect the trial that the resulting conviction violated due process because there was no credible evidence to support petitioner's theory that he did not intend to aid Maxwell and the prosecutor did not argue an aiding and abetting theory of liability to the jury; thus, the failure to define aiding and abetting did not so infect the entire trial that the resulting conviction violated due process. In the closing argument, the prosecutor quickly referred to the possibility that petitioner was aiding and abetting Maxwell when he pulled out his revolver. However, as the California Court of Appeal pointed out, this reference was part of a larger argument in support of the prosecutor's felony-murder theory, i.e., that petitioner was "in the process of the robbery at the point when Tufono comes out and point[ed] that shotgun." *People v. Ivory*, 2010 WL 3213697, at *14. The prosecutor was emphatic that this was a felony murder case, "plain and simple." RT 574; *see also* RT 573, 577, 619. The jury was thoroughly instructed on felony murder, and that was the theory of liability the prosecutor unwaveringly pursued. Thus, the other jury instructions that were given provided adequate guidance to the jury in light of the evidence

Assuming arguendo that failure to define aiding and abetting was constitutional error, any error was harmless. As the California Court of Appeal stated, the evidence of petitioner's guilt as Tufono's murderer was overwhelming. Petitioner's testimony as to what had happened was internally inconsistent; his trial testimony differed in significant respects from his statement to police given hours after the killing; his explanation of the events was implausible; and his story was not supported by the any other testimony. If there was any error, it did not have substantial and injurious effect or influence in determining the jury's verdict. The California Court of Appeal's rejection of petitioner's instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the Supreme Court.

Petitioner is not entitled to the writ on this claim.

C.      No Certificate Of Appealability

A certificate of appealability will not issue. See 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**CONCLUSION**

The petition for writ of habeas corpus is denied on the merits.

The clerk will close the file.

IT IS SO ORDERED.

DATED: October 19, 2012

SUSAN ILLSTON
United States District Judge